# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CHAMBERS OF
SUSAN K. GAUVEY
U.S. MAGISTRATE JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
MDD_skgchambers@mdd.uscourts.gov
(410) 962-4953
(410) 962-2985 - Fax

July 12, 2012

William J. Nicoll, Esq.
Jenkins, Block & Associates, P.C.
The Symphony Center, Suite 206
1040 Park Avenue
Baltimore, MD 21201

Alex S. Gordon, Esq.
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, MD 21201

> Re:  Connie Jean Hooks v. Michael J. Astrue, Commissioner,
>      Social Security, Civil No. SKG-11-423

Dear Counsel:

Claimant, Connie Jean Hooks, by her attorney, William James Nicoll and Jenkins, Block & Associates, P.C., filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), who denied her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under sections 205(g) and 1631(c)(3) of the Social Security Act ("the Act").

This case has been referred to the undersigned magistrate

judge by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301. (ECF No. 3; ECF No. 7). Currently pending before the Court are cross motions for summary judgment. (ECF No. 16; ECF No. 20). No hearing is necessary. Local Rule 105.6. For the reasons that follow, the Court hereby DENIES plaintiff's Motion for Summary Judgment and AFFIRMS defendant's Motion for Summary Judgment.

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on April 29, 2005, alleging that she had been unable to work since September 15, 2003 due to Degenerative Disc Disease (DDD) of the lumbar and cervical spine, bilateral shoulder impingement syndrome, bilateral degenerative osteoarthritis of the knees, obesity, depression, anxiety disorder, and asthma. (R. 217-220). Plaintiff's application was denied at both the initial and reconsideration levels. (R. 14-51; R. 57-78). Thereafter, plaintiff filed a request for  hearing on December 12, 2005. (R. 9-11). Following the hearing, plaintiff was sent for two consultative evaluations, and additional medical evidence was submitted on her behalf. On December 6, 2007, the ALJ held a second hearing.  In a written decision dated January 15, 2008, the Administrative Law Judge ("ALJ") denied plaintiff's claim. (R. 57-58). On February 1, 2008, plaintiff requested the Appeals

2

Council to review the ALJ's decision. (R. 56). On April 29, 2008, plaintiff filed a second claim on April 29, 2008, alleging disability as of January 16, 2008, the date immediately after the ALJ's denial.

On December 11, 2009, the Appeals Council granted review of the ALJ's decision of January 15, 2008, and reopened the allowance on the subsequent claim, thus consolidating both claims for a new hearing. (R. 53). On April 15, 2010, the ALJ held an additional hearing.

In a written decision dated June 9, 2010, the ALJ again denied plaintiff's claim after determining that she could perform a range of jobs, including copier operator, interviewer, library clerk, surveillance monitor, order clerk, and information clerk. (R. 14-51). The Appeals Council denied plaintiff's request for review on January 21, 2011, making the ALJ's June 9, 2010 opinion the final decision of the agency. (R. 9-11).

On February 16, 2011, plaintiff filed this action, seeking review of that final decision pursuant to 42 U.S.C. § 405(g). (ECF. No. 1)

## II. FACTUAL BACKGROUND

The Court has reviewed the Commissioner's Statement of Facts and, finding that it accurately represents the record in all material respects, hereby adopts it. (See ECF No. 20, 3-16).

3

### III. ALJ FINDINGS

In reviewing plaintiff's eligibility for DIB and SSI, an ALJ must consider all of the evidence in the record and follow the sequential five-step analysis set forth in the regulations to determine whether the claimant is disabled as defined by the Act. 20 C.F.R § 416.920(a)(2011).[1]  If the agency can make a disability determination at any point in the sequential analysis, it does not review the claim further.  20 C.F.R. § 404.1520(a)(4)(2011).  After proceeding through each of the required steps, the ALJ in this case concluded that plaintiff was not disabled as defined by the Act.  (R. 18-50).

At the first step of the sequential analysis, the claimant must prove that she is not engaged in "substantial gainful activity."[2] 20 C.F.R. § 416.920(a)(4)(i)(2011).  If the ALJ finds

---

[1] Disability is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A)(2011).

[2] Substantial gainful activity is defined as "work activity that is both substantial and gainful."  20 C.F.R. § 416.972 (2011). Work activity is substantial if it involves doing significant physical or mental activities, and even if it is part time or if plaintiff is doing less, being paid less, or has fewer responsibilities than when she worked before.  20 C.F.R. § 416.972(b) (2011).  Substantial gainful activity does not include activities such as household tasks, taking care of

that the claimant is engaged in "substantial gainful activity," she will not be considered disabled. Id. Applying 20 C.F.R. 404.1571 et seq., and 416.971 et seq., the ALJ in this case determined that plaintiff had not engaged in substantial gainful activity since September 15, 2003. (R. 20).

At the second step of the sequential analysis, the ALJ must determine whether the claimant has a severe, medically determinable impairment or combination of impairments that limits her ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c); see also 20 C.F.R. §§ 404.1521, 416.921(2011). In addition, there is a durational requirement that the claimant's impairment last or be expected to last for at least 12 months. 20 C.F.R. § 416.909 (2011). Here, the ALJ found that at all relevant times, plaintiff had severe impairments consisting of degenerative disc disease of the lumbar and cervical spine, shoulder tendonitis, asthma, obesity, depression, generalized anxiety disorder, and cannabis abuse. (R. 20).

At step three, the ALJ considers whether the claimant's impairments, either individually or in combination, meet or equal an impairment enumerated in the "Listing of Impairments"

---

oneself, social programs, or therapy.  20 C.F.R. § 416.972(c) (2011).

in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listing" or "LOI").   20
C.F.R. § 416.920(a)(4)(iii)(2011). Here, the ALJ determined that
plaintiff did not experience an impairment or combination of
impairments that met or equaled one of the listed impairments
found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 35).

Before an ALJ advances to the fourth step of the sequential
analysis, she must assess the claimant's "residual functional
capacity" ("RFC"), which is then used at the fourth and fifth
steps. 20 C.F.R. § 404.1520(e)(2011). RFC is an assessment of an
individual's ability to do sustained work-related physical and
mental activities in a work setting on a regular and continuing
basis. SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996). The ALJ must
consider even those impairments that are not "severe." 20 C.F.R.
§ 404.1545(a)(2)(2011). In determining a claimant's RFC, ALJs
evaluate the claimant's subjective symptoms (e.g., allegations
of pain) using a two-part test. Craig v. Chater, 76 F.3d 585,
594 (4th Cir. 1996); 20 C.F.R. § 404.1529. First, the ALJ must
determine whether objective evidence shows the existence of a
medical impairment that could reasonably be expected to produce
the actual alleged symptoms. 20 C.F.R. § 404.1529(b). Once the
claimant makes that threshold showing, the ALJ must evaluate the
extent to which the symptoms limit the claimant's capacity to
work. 20 C.F.R. § 404.1529(c)(1). At this second stage, the ALJ

6

must consider all the available evidence, including medical history, objective medical evidence, and statements by the claimant. 20 C.F.R. § 404.1529(c).

Here, the ALJ determined that plaintiff retained the following residual functional capacity: she can perform simple, unskilled light work and can lift 20 pounds occasionally and 10 pounds frequently, can stand or walk for 6 hours in an 8 hour day, can frequently push and pull with the upper and lower extremities, and can frequent handle, finger, and feel (R. 38). The ALJ also found that plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. (Id.). However, she could never climb a ladder, rope, or scaffold, and she must avoid concentrated exposure to odors, dusts, gases, poor ventilation, hazards, humidity, wetness, and background noise. (Id.). Finally, the ALJ found that plaintiff must avoid overhead lifting and could only perform low stress work at a non-production pace. (Id.).

At the fourth step of the sequential analysis, the ALJ must consider whether the claimant retains the RFC necessary to perform past relevant work.[3] 20 C.F.R. §§ 404.1520(e),

---

[3] The regulations state that "impairment(s) and any related symptoms, such as pain, may cause physical and mental limitations that affect what [one] can do in a work setting . .

416.920(e)(2011). The ALJ here found that plaintiff would be unable to return to past relevant work as an auto body detailer or fast food worker. (R. 39).

If the claimant is unable to resume her past relevant work, the ALJ proceeds to the fifth and final step of the sequential analysis. This step requires consideration of whether, in light of vocational factors such as age, education, work experience, and RFC, the claimant is capable of other work in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g)(2011). At this step, the burden of proof shifts to the agency to establish that the claimant retains the RFC to engage in an alternative job which exists in the national economy. McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980). The agency must prove both the claimant's capacity to perform the job, and that the job is in fact available. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983). Before the agency may conclude that the claimant can perform alternative skilled or semi-skilled work, it must show that she possesses skills that are transferable to those alternative positions or that no such transferable skills are necessary. McLain, 715 F.2d at 869.

---

. residual functional capacity is the most [one] can still do despite [those] limitations." 20 C.F.R. § 404.1545(2011).

Here, the ALJ determined that plaintiff retained the skill and capacity to perform jobs that existed in significant numbers in the national economy. (R. 49). Thus, the ALJ concluded that plaintiff was not disabled within the meaning of the Act from the alleged onset date through the date of her decision, and therefore, is not entitled to disability benefits pursuant to Titles II or XVI of the Act. (R. 50.) (citing 20 C.F.R. §§ 404.1520(g), 416.920(g)(2011)).

## IV.   STANDARD OF REVIEW

The function of this Court on review is to leave the findings of fact to the agency and to determine upon the whole record whether the agency's decision is supported by substantial evidence, not to try Ms. Hooks' claim de novo. King v. Califano, 599 F.2d 597, 598 (4th Cir. 1979). This Court must uphold the Commissioner's decision if it is supported by substantial evidence, and if the ALJ employed the proper legal standards. 42 U.S.C. §§ 405(g), 1383(c)(3) (2001); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence "consists of more than a scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). It is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v.

Perales, 402 U.S. 389, 401 (1971) (internal quotations omitted).

In reviewing the decision, this Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig, 76 F.3d at 589; Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).   The Commissioner, as fact finder, is responsible for resolving conflicts in the evidence.   Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir. 1962).   If the Commissioner's findings are supported by substantial evidence, this Court is bound to accept them.   Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). However, despite deference to the Commissioner's findings of fact, "a factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman, 829 F.2d at 517.   The Court has authority under 42 U.S.C. § 405(g) to affirm, modify, or reverse the decision of the agency "with or without remanding the case for a rehearing." Melkoyan v. Sullivan, 501 U.S. 89, 98 (1991).

## V.   DISCUSSION

Plaintiff raises two arguments on appeal: (1) the ALJ failed to give proper, controlling weight to the opinion of Dr. Fox, her treating physician; and (2) the ALJ erroneously relied on a non-examining source, Dr. Moore, to deny her benefits. (ECF No. 16, 5-8). For the reasons set forth below, the Court rejects

10

both of plaintiff's arguments.

The standard for reviewing and weighing medical opinions is set forth in 20 C.F.R. § 416.927(d), which states in pertinent part:

> [W]e give more weight to opinions from your treating sources, since those sources are . . . most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone. . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. . . We will always give good reasons. . . for the weight we give your treating source's opinion.

20 C.F.R. § 416.927 (d)(2). Therefore, opinions of treating physicians which are supported by medically acceptable techniques and are not inconsistent with other substantial evidence in the record are to be given great weight.

Additionally, SSR 96-2p, 1996 SSR LEXIS 9 provides that a medical opinion can only be given controlling weight if it is (1) an actual opinion; (2) from a treating source; (3) well supported by evidence; and (4) not inconsistent with other substantial evidence in the case.

20 C.F.R. §404.1527 (d) (2) outlines the factors that an ALJ

11

must consider when determining whether to afford a treating source's opinion controlling weight. The factors are as follows: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2)the "[n]ature and extent of the treatment relationship[;]" (3) the extent to which the opinion is supported by medical evidence of record; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating physician (because the ALJ generally gives more weight to specialists); and (6) "any [other] factors. . . which tend to support or contradict the opinion." 20 C.F.R. § 404.1527 (d)(2).

As to the first argument, plaintiff contends that the ALJ weighed Dr. Fox's opinion incorrectly because as her treating physician, his opinions from April 6, 2007, May 17, 2007, and November 21, 2009 were entitled to controlling weight. (ECR 16, 5-6). In those opinions, Dr. Fox opined that plaintiff could only stand for one hour in an eight hour day, must be limited to less than sedentary activity, needed ambulatory assistance while traveling, and could lift less than five pounds occasionally, amongst other restrictions. (R. 691; R. 702; R. 764). Firstly, plaintiff argues that these opinions deserve deference because they are corroborated by MRI reports and testimony from Dr. Barrish and Dr. Kramer. (ECR No. 16, 6-7). Secondly, plaintiff

contends that the ALJ misconstrued the evidence, dismissing Dr. Kramer's opinion as based solely on Dr. Barrish's report when nothing in the record indicates this as the case. (ECF No. 16-7). Thirdly, plaintiff contends that the ALJ's evaluation of Dr. Fox's opinions is erroneous because it does not explicitly address the 20 C.F.R. § 404.1527(d)(2) factors which an ALJ must consider in determining whether to afford controlling weight. (ECR. No. 16-7).

As to the second argument, plaintiff contends that the ALJ erred in assigning "great weight" to Dr. Moore's October 19, 2005 opinion because that opinion was formulated five years prior to the ALJ's final determination. (ECR No. 16-8). Also, plaintiff argues the ALJ erred in finding "mild" limitations of Activities of Daily Living (ADL) when Dr. Moore had found "moderate" limitations. (Id.).

Defendant in turn argues that the ALJ carefully considered Dr. Fox's opinion and appropriately gave it less weight because it was only partially consistent with the totality of the record. (ECR No. 20-19). Defendant also argues that the ALJ considered Dr. Moore's opinion carefully and only assigned "great weight" to the parts which were consistent with the record as a whole. (ECR No. 20-28).

After careful review of the record, the Court rejects

plaintiff's arguments.

## A. The ALJ appropriately gave less weight to the opinion of plaintiff's treating physician, Dr. Fox.

Under the law, a treating physician's opinion is entitled to deference. However, if the treating physician's opinion is not supported by clinical evidence, or is inconsistent with other substantial evidence, it should be accorded significantly less weight.  See <u>Craig v. Chater</u>, 76 F.3d 585, 590 (1996). Under such circumstances, the ALJ has the discretion to give less weight to the testimony of a treating physician in the face of "persuasive contrary evidence". See <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (1992). In this case, it is clear that the ALJ found "persuasive contrary evidence" to undermine portions of Dr. Fox's opinion.

## 1. Plaintiff's Lumbar, Cervical, Shoulder and Knee Conditions and Pain

The ALJ found "persuasive contrary evidence" to support a determination that plaintiff's lumbar, cervical, shoulder, and knee pain were well managed and did not limit her to the extent maintained by Dr. Fox.  As to plaintiff's lumbar pain, the ALJ noted Dr. Greco's review of a MRI from March 10, 2005. (R. 542; R. 378). While plaintiff had presented to Dr. Greco with excessive back pain, the MRI revealed no nerve impingement (R. 378). On August 5, 2005, plaintiff began treatment with Dr. Fox

14

for pain management. (R. 694). Dr. Fox noted that as a result of a series of lumbar epidural steroid injections, plaintiff had "good pain relief." (R. 695). The ALJ correctly noted that throughout 2008 and 2009, plaintiff's back pain was stabilized through the lumbar injections and pain medication. (R. 975; R. 983, R.987; R. 995; R. 1006; R. 1009; R.1011). The ALJ also noted that plaintiff reported decrease in back pain when her prescription for Fentanyl was increased, and increase in back pain when her prescription ran out, thereby indicating that the medication worked effectively. (R.972; R. 974; R. 1015).

As for plaintiff's cervical pain, the ALJ noted the May 2005 MRI report which indicated mild canal narrowing at C3-C4 and C5-C6, mild to moderate canal narrowing with moderate C5 foraminal narrowing at C4-C5, and moderate to severe left C7 foraminal narrowing due to asymmetric uncinate hypertrophy at C6-C7. (R. 540). Plaintiff underwent a cervical epidural injection on October 18, 2005 to treat the pain. (R. 700). She later complained of worsening neck pain in December 2005 (R. 743). Dr. Hamlette prescribed Flexeril to treat the pain. (R. 743). On April 6, 2007, Dr. Fox administered a cervical injection to help control the pain, as plaintiff indicated that her previous injection had provided six months of pain control (R. 695-696). By April 13, 2007, Dr. Roe, found that plaintiff exhibited a

15

full range of motion with no pain on palpation of her cervical
spine. (R. 703). Plaintiff continued to undergo cervical
injections. (R. 700). Again on September 18, 2007 and November
29, 2007, Dr. Roe found that plaintiff exhibited a full range of
motion with no pain to palpation of her cervical spine. (R. 801;
R. 802.) Plaintiff continued receiving the therapeutic
injections. (R. 1015). In November 21, 2008, she again had a
full range of motion in her cervical spine with no pain to
palpation, following an injection in September 2008. (R. 1015-
1016; R. 1009).  However, on December 18, 2008, plaintiff was
hospitalized for an exacerbation of neck pain. (R. 1054). She
complained of pain at a level of 9/10. After taking the pain
medication Dilaudid, plaintiff's pain was reduced to a level of
3/10. (Id.).  On December 30, 2008, two weeks after the
hospitalization, plaintiff reported that her pain had
stabilized. (Id.). On August 7, 2009, the plaintiff again
exhibited a full range of motion in her cervical spine with no
pain on palpation. (R. 983).

Thus, the ALJ correctly inferred that plaintiff's therapeutic
injections controlled her cervical pain when undertaken with
pain medication. The facts above reflect that plaintiff has
controlled her neck pain consistently since early 2007, with one
exacerbation in December 2008.

Regarding plaintiff's shoulder tendonitis, the ALJ noted that despite plaintiff's complaints of bilateral shoulder pain, she exhibited a full range of motion on August 29, 2007, and full strength in her upper extremities on September 11, 2008. (R. 871; R. 926). The ALJ noted that plaintiff has been undergoing therapeutic injections for her shoulder pain. (R. 968; R. 972). She had not had any emergency room visits for her shoulder pain, and her range of motion is only reduced in abduction and external rotation. (R. 975; 983).

As to plaintiff's knee impairment, imaging studies from November 2008 reveal mild degenerative change. (R. 1011). Plaintiff received one knee injection in November 2008. (R. 1010). She did not return for any additional knee treatment until March 2009. (R. 995). Plaintiff had a series of Synvisc knee injections in May 2009 which provided good relief, reducing her pain to a level of 4/10. (R. 990; R. 987). She continued to undergo therapeutic injections, and by August 2009, plaintiff had a normal range of motion with full extension and full flexion. (R. 983). Her imaging studies continued to reflect minimal arthritic changes, which does not support Dr. Fox's conclusion that plaintiff was severely limited in lifting, daily activity, etc. (R. 972).

17

Thus, there is substantial "persuasive contrary evidence" that plaintiff's back, neck, shoulder, and knee pain were all well controlled, thus undermining Dr. Fox's imposition of severe, functional limitations.

## 2. Wheelchair Use

The ALJ found "persuasive contrary evidence" that plaintiff did not require a wheelchair as maintained by Dr. Fox.  On April 29, 2005, Dr. Khan observed plaintiff using a rolling walker, and on May 17, 2005, he observed her using a cane. However, during both of these visits, Dr. Khan noted "giveaway weakness", a common pattern of feigned weakness. (R. 532; R. 534). On May 26, 2005, plaintiff again visited Dr. Khan using a walker, though he noted she could walk without difficulty. (R. 533). By June 27, 2005, Dr. Khan noted that plaintiff's gait was normal, and she could walk without a walker. (R. 532).

On April 13, 2007, Dr. Roe, opined that while plaintiff had a limited lumbar range of motion, she exhibited no difficulty heel toe walking and had a stable spine. (R. 703; R. 704). On August 8, 2007, only three weeks after Dr. Barrish's July 18, 2007 opinion limiting plaintiff to less than sedentary activity, a nurse practitioner observed plaintiff ambulating with a cane while wearing two inch heels. (R. 763-768;  R. 784). About four weeks after Dr. Barrish's opinion, on August 22, 2007,

plaintiff's physical therapist reported that patient was able to walk fifteen to twenty minutes daily and her endurance had "greatly improved". (R. 1019). In June 2008, plaintiff reported to her psychiatrist that she had increased her exercise routine. (R. 894). These facts support a conclusion that  despite Dr. Fox's opinion, the plaintiff's wheelchair, walker, and quad cane were not medically necessary to control her lumbar pain. (R.697; R. 768).  There is no evidence in the record to suggest that the ambulatory devices were prescribed by a doctor, and the medical record as a whole does not support a conclusion that plaintiff required any of them to ambulate.

### 3. Inconsistency of Dr. Fox's Treatment and Notes With His Opinions

The ALJ correctly found that Dr. Fox's own treatment notes were inconsistent with his opinions imposing lifting and other functional limitations on plaintiff.  For example, on several occasions, despite plaintiff's significant complaints about back and neck pain, Dr. Fox found that she was non-tender to palpation in these areas.  (R. 696, R. 701, R. 913, R. 921). Dr. Fox also noted on several occasions that plaintiff had a normal gait (R. 905; R. 919; R. 921) and extremities in equal strength (R. 905; R. 908; R. 910; R. 913; R. 919; R. 921).

### 4. Treatment and Opinions of Dr. Barrish and Dr. Kramer

19

The ALJ correctly weighed other supporting medical evidence,
including Dr. Barrish's and Dr. Kramer's notes in light of the
total medical record.  Plaintiff argues that Dr. Fox's opinions
are entitled to controlling weight because they are
substantiated by MRI reports, and testimony from Dr. Barrish and
Dr. Kramer. (ECR No. 16, 6-7). In fact, there is only one
reference to an MRI report in direct support of Dr. Fox's
opinion. (R. 692).  This was the likely basis for the ALJ's
inference that Dr. Fox relied heavily upon plaintiff's
subjective assessments of pain in formulating his opinions.
While Dr. Fox's records are non-specific as to the degree to
which he relied upon objective tests versus plaintiff's
subjective complaints, and Dr. Barrish's opinion does impose
ambulatory restrictions similar to Dr. Fox's, the Court is
nonetheless convinced the ALJ correctly weighed the substantial
evidence throughout the record indicating that plaintiff's
lumbar, cervical, shoulder and knee pain were well controlled
and the ambulatory aids were not medically necessary as detailed
above. (R. 768)

The Court is convinced that the ALJ correctly weighed Dr.
Kramer's opinion.  The ALJ correctly weighted the part of Dr.
Kramer's opinion that plaintiff could sit for six hours in an
eight hour day, occasionally climb a ramp or stairs, balance,

stop kneel, crouch or crawl, but never climb a rope ladder or
scaffold, as this is corroborated by both Dr. Biddison and Dr.
Ahn. (R. 48; R. 580-581; R. 609-610). The ALJ correctly assigned
less weight to Dr. Kramer's lifting restrictions for the reasons
previously discussed, namely plaintiff's shoulder, back and neck
pain were sufficiently managed over time, and she could walk
without a wheelchair. As further evidence, Dr. Barrish's
September 11, 2008 opinion on plaintiff's lifting abilities is
not as limiting as Dr. Kramer's; he opines that plaintiff could
lift and carry ten pound frequently and twenty pounds
occasionally. (R. 926). Dr. Biddison and Dr. Ahn similarly
opined that plaintiff could lift up to 20 pounds occasionally.
(R. 580; R.609). Thus, in spite of Dr. Barrish's and Dr.
Kramer's  supporting assessment on ambulatory and lifting
restrictions, the Court finds there is significant "persuasive
contrary evidence" in the record to support the ALJ's assigning
of less weight to Dr. Fox's testimony.

### 5. Consideration of § 404.1527(d)(2) factors

The ALJ gave sufficient consideration to the § 404.1527(d)(2)
factors in assigning less weight to Dr. Fox's opinion.  The
Court agrees with plaintiff that the ALJ did not explicitly
address each of the factors outlined in 20 C.F.R.
§404.1527(d)(2) which an ALJ must consider in assigning weight

to a treating physician's opinion. (ECF No. 16-7).  The factors
are as follows: (1) the length of the treatment relationship and
frequency of examination; (2) the nature of the treatment
relationship; (3) the extent to which the opinion is supported
by medical evidence in the  record; (4) the consistency of the
opinion with the record as a whole; (5) the specialization of
the treating physician; and (6) any other factors which tend to
support or contradict the opinion. 20 C.F.R. § 404.1527 (d)(2).

However, nothing in § 404.1527(d)(2) requires an express,
formulaic discussion of each factor. See 20 C.F.R. § 404.1527
(d)(2). Although the Fourth Circuit has not yet addressed
whether an ALJ must explicitly analyze every factor, several
districts courts within the Fourth Circuit have rejected such a
requirement. See, e.g., Overcash v. Astrue, 2010 U.S. Dist.
LEXIS 141695, at *16-17 (W.D.N.C. May 21, 2010) ("While an ALJ's
decision need not explicitly discuss each factor [set forth in
20 C.F.R. § 404.1527(d)(2)], it must justify the amount of
weight afforded with specific reasons."); Hendrix v. Astrue,
2010 U.S. Dist. LEXIS 90922, at *7-8 (D.S.C. Sept. 1, 2010)
("[A]n express discussion of each factor is not required as long
as the ALJ demonstrates that he applied the §404.1527(d) factors
and provided good reasons for his decision."); Clay v. Astrue,
2008 U.S. Dist. LEXIS 116554, at *47-48 (N.D. W. Va. Oct. 24,

2008) ("[W]hile the ALJ did not explicitly and specifically reference every factor enumerated in § 404.1527(d)(2)…he summarized almost the entire medical record before him… [and] properly determined that the opinions of [the treating physicians] were not entitled to great weight.").

Thus, there is no appellate injunction to expressly "check off" every § 404.1527 (d)(2) factor in an ALJ's opinion. However, what is clear under Fourth Circuit law is that the ALJ must at least indicate that she was aware of and considered all of the factors. <u>Burch v. Apfel</u>, 9 Fed. Appx. 255, 2001 WL 574634, at *259-60. In this case, it is clear that the ALJ implicitly considered the six factors in formulating her opinion.

First, the ALJ noted that Dr. Fox began his treatment of plaintiff on October 18, 2005. There are references to Dr. Fox's continued care and examination on October 18, 2005, November 15, 2005, December 2005, April 6, 2007, June 25, 2007, November 2, 2007, February 12, 2008, April 30, 2008, and September 17, 2008. (R. 21, R.22, R.23, R. 24, R. 26). Thus, it is clear that the ALJ was aware of the length of the treatment relationship and frequency of examination. Second, there are references throughout the opinion to the nature and extent of the treatment relationship. The ALJ noted that Dr. Fox administered the lumbar

and cervical epidural injections to plaintiff and served as a source of advice for plaintiff during pain flare ups. (R. 21-22) The ALJ further noted that Dr. Fox spoke with plaintiff about her pain over extended time periods, wrote prescriptions for pain medication, performed physical examination of plaintiff's neck and back, and advised about possibilities for surgery. (R. 22). Dr. Das considered writing to Dr. Fox regarding her pain medication regimen, an indication that Dr. Fox was managing her medication. (R. 24). Through these various references, the Court is convinced that the ALJ appreciated the quality of the relationship between plaintiff and Dr. Fox. As to the third and fourth factors, the ALJ explicitly delineated the extent to which Dr. Fox's opinion is supported and unsupported by the medical record as a whole. (R. 47, R. 48).  As to the fifth factor, the ALJ acknowledged Dr. Fox's specialty in pain management. (R. 40). Finally, the ALJ's opinion included relevant discussion of other physicians' testimony which contradicted Dr. Fox's opinion. (R. 40-42). Accordingly, the Court is satisfied that the ALJ considered all six factors set forth in §404.1527 (d)(2) in formulating her opinion.

Thus, on the basis of persuasive contrary evidence in the record indicating that patient's back, neck, shoulder, and knee pain were not as extensive as indicated by Dr. Fox,

inconsistencies in Dr. Fox's own treatment notes and opinion,
scant reference in Dr. Fox's opinion to MRI or other objective
testing, the outweighing of Dr. Kramer's supporting opinion by
the opinions of Dr. Biddison, Ahn, and Barrish, and sufficient
demonstration that the §404.1527 (d)(2) factors were considered
throughout the opinion, the Court finds that the ALJ correctly
assigned less weight to Dr. Fox's opinion despite his status as
treating physician.

**B. The ALJ correctly assigned weight to Dr. Moore's opinion
based on a totality of the record.**

First, plaintiff argues that the ALJ erred in assigning "great
weight" to Dr. Moore's October 19, 2005 opinion that plaintiff
could perform simple tasks from a mental standpoint because it
was formulated five years prior to the ALJ's final decision.
Second, plaintiff contends that the ALJ failed to appreciate Dr.
Moore's finding that she had "moderate" limitations in ADL,
instead finding "mild limitations" in ADL.

As to the first argument, the record reflects that although
Dr. Moore performed a mental assessment back in October 2005,
her opinions that plaintiff could perform simple work-related
tasks and relate appropriately to others are consistent with the
record as a whole. (R. 494-495). Specifically, Dr. Moore's
opinion is consistent with Dr. Harkhani's psychiatric reports

from August 2007 to September 2008. (R. 774; 775; R. 935; R. 936). In the August 2007 report, Dr. Harkhani noted that plaintiff's memory was intact and she had good concentration. (R. 772; R. 775). In the August 2007 and September 2008 reports, Dr. Harkhani opined that plaintiff could get along well with others, relate to coworkers and supervisors, and possessed good insight and judgment. (R. 772; R. 775; R. 936; R. 933).  Thus, there is substantial evidence in the record after 2005 supporting the ALJ's decision to grant great weight to Dr. Moore's opinion.

As to the second argument, the ALJ was correct to assign less weight to Dr. Moore's opinion that plaintiff experienced "moderate" limitations in ADL because the record reflects that plaintiff's difficulties with ADL actually arose from physical, not the mental impairments assessed by Dr. Moore.  (R. 496). Also, Dr. Peterson also opined "mild" ADL restrictions on August 12, 2005. (R. 603). Lastly, ADL is merely one of four categories used to determine functional limitation.  Thus, it is far from clear, indeed highly doubtful, that a change from a finding of "mild" to "moderate" limitation in ADL would compel a finding of disability. (R. 682).  Thus, there is substantial evidence in the record to support the ALJ's decision to grant less weight to Dr. Moore's opinion on ADL.

26

## VI.    CONCLUSION

For the reasons set forth above, the Court DENIES the plaintiff's motion for summary judgment and GRANTS defendant's motion for summary judgment.

Despite the informal nature of this letter, it shall constitute an Order of the Court, and the Clerk is directed to docket it accordingly.

                                   Sincerely yours,

                                        /s/

                                   Susan K. Gauvey
                                   United States Magistrate Judge